**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) | |
| 100 F Street, N.E. | ) | **Civil Action No.** |
| Washington, D.C.  20549 | ) | **COMPLAINT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **RAYTHEON COMPANY, DANIEL P. BURNHAM,** | ) | |
| **and ALDO R. SERVELLO,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges that:

### SUMMARY

1.     Between 1997 and 2001, Raytheon Company and certain members of its senior management ("Raytheon" or the "company") made false and misleading disclosures and used improper accounting practices that operated as a fraud by masking the declining results and deteriorating business of Raytheon Aircraft Company ("RAC") and inaccurately reporting the company's operating results on both a segmented and consolidated basis.  As set forth below, certain of these disclosures and accounting practices were undertaken by or with the knowledge of senior company officers, including Daniel P. Burnham ("Burnham") and Aldo R. Servello ("Servello").

2.     From 1997 through 1999, Raytheon prematurely recognized revenue on RAC's sale of unfinished aircraft through improper "bill and hold" transactions.  As a result, the company materially overstated RAC's net sales by approximately $80 million at year-end 1997 and $110 million at year-end 1998, which led to 13 percent overstatements of the subsidiary's

annual operating income in both of these periods.  These errors enabled both Raytheon and RAC to meet certain internal and external earnings targets.  Although Raytheon did restate for these material errors at year-end 1999, the company misleadingly attributed the restatement to additional "clarification" supposedly provided by "new guidance" on revenue recognition recently issued by the Commission in Staff Accounting Bulletin No. 101 ("SAB 101") instead of the improper accounting practices that had occurred at RAC prior to that time.

3.      In addition, between 1997 and 2001, Raytheon failed to fully and accurately disclose known risks, trends, uncertainties, and other information concerning the deteriorating state of RAC's commuter aircraft business and the negative impact this decline was having on asset values associated with RAC's line of nineteen-seat, turboprop aircraft (the "commuters" or the "1900s") and, thus, on the company's (including RAC's) results of operations.  Raytheon also engaged in several improper accounting practices that delayed and mischaracterized known losses associated with RAC's commuter line during this time period.

4.      As Raytheon's CEO, Burnham failed to make or ensure the timely, accurate, and full disclosure of these material trends and uncertainties in the company's public filings during 2000 and 2001, failed to take sufficient steps to ensure that Raytheon properly accounted for the company's on- and off-balance sheet commuter assets during this time period, and did not ensure that the company maintained an adequate system of internal accounting controls related to these assets.  As RAC's Deputy CFO and Controller, Servello failed to ensure that Raytheon properly accounted for the company's on- and off-balance sheet commuter assets during 2000, and he failed to ensure that Raytheon maintained an adequate system of internal accounting controls at RAC related to the proper recording of these assets.

5.      Had Raytheon properly accounted for its commuter assets, the company would have reported material reductions in RAC's reported operating income of at least $34 million, $22 million, and $21 million at year-end 1998, 1999, and 2000, respectively, which represented 13 percent of the subsidiary's reported annual operating income in each of these periods. Moreover, RAC's operating results would have been further reduced by at least $67 million (41 percent) at year-end 2000 had Burnham, Servello, and others in senior Raytheon and RAC management timely and appropriately recognized losses inherent in a planned "soft landing" of the commuter aircraft line. Furthermore, at this time, internal company documents and other information indicate that these senior executives expected commuter losses of $240 million given the cash sales prices that had been approved in the "soft landing," and a charge of $67 million to $240 million would have reduced Raytheon's 2000 profit before taxes by at least 8 to 27 percent. Burnham and other senior Raytheon officers, however, caused Raytheon to improperly take this charge in the third quarter of 2001, when the company wrote down its on- and off-balance sheet commuter assets by $693 million after the terrorist attacks of September 11th. Given the charge that the company should have taken at year-end 2000, Raytheon's third quarter 2001 commuter loss provision was materially overstated by at least 10 to 53 percent.

## JURISDICTION

6.      This Court has jurisdiction over this matter pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v] and Sections 21(d)(3)(A) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d)(3)(A) and 78aa].

## DEFENDANTS

7.      Raytheon is a Delaware corporation, headquartered in Waltham, Massachusetts. The company is an industry leader in defense, government electronics, space technology, and

business and special mission aircraft. Between 1997 and 2001, Raytheon reported between $13 billion and $20 billion in net sales revenue annually and employed between 75,000 to 120,000 individuals. During this time period and continuing through today, Raytheon's securities have been registered with the Commission pursuant to Section 12(b) of the Securities Act and listed on the New York, Chicago, and Pacific Exchanges.

8.     Burnham, age 59, became Raytheon's President and Chief Operating Officer in July 1998. He served as Raytheon's Chief Executive Officer from December 1998 through July 2003 and as Chairman from August 1999 until January 2004.

9.     Servello, age 50, held several senior positions in RAC's financial organization between July 1998 to July 2001, including Controller, Acting CFO, and Deputy CFO. Since July 2001, Servello has been employed at other divisions of Raytheon.

## BACKGROUND

10.     In the early 1990s, Raytheon was a diversified, multi-national conglomerate, which operated in the defense, electronics, engineering and construction, major appliances and aircraft businesses. The company formed RAC in 1994 through the combination of Beech Aircraft and Raytheon Corporate Jets, and the wholly-owned Raytheon subsidiary has been reported as a separate segment in all of the company's public filings since that time. RAC manufactures, markets, and services business jets, turboprops, and piston-powered aircraft for the world's commercial, fractional ownership, and military aircraft markets. Due to the cyclical nature of these markets, RAC often experienced fluctuating results. For example, between 1997 and 2001, RAC generated between $2.3 billion and $3.2 billion in net sales revenue for the company annually, accounting for 13 to 19 percent of Raytheon's consolidated sales revenues.

11.    In 1997, Raytheon completed two multi-billion dollar defense acquisitions in an effort to streamline its operations and solidify its position as one of the nation's largest military contractors. These acquisitions led to a doubling of Raytheon's long-term debt load (increasing it to over $8 billion) and a substantial lowering of Raytheon's credit rating. In an effort to reduce the burden of its debt expense on earnings and cash flows, Raytheon began to divest many of its "non-core" commercial units, using the cash generated by these sales to pay down debt it incurred as a result of its defense acquisitions. RAC was ultimately targeted for divestiture as part of this plan.

### RAYTHEON'S IMPROPER BILL AND HOLD AIRCRAFT SALES

12.    Between 1997 and 1999, RAC prematurely recognized revenue on improper "bill and hold" aircraft sales (also known as "green sales" or "financial deliveries") that did not comply with generally accepted accounting principles ("GAAP").

13.    In particular, every quarter and more prevalently at the end of the fiscal year, members of senior RAC management held "executive review sessions," in which they identified unfinished planes in the production process that could be "pulled forward" for a "financial delivery" to "bridge" certain "gaps" or "shortfalls" in RAC's performance targets. It was inappropriate to recognize revenue on these sales because the aircraft were not complete and ready for shipment, the seller (RAC) and not the purchaser had requested the bill and hold sale, and significant incentives were being given to customers in order to induce them to accept a "sale" before quarter- or year-end, all of which disqualified the aircraft for sales treatment under GAAP.

14.    In 1997, RAC's green sales resulted in an $80 million overstatement of the subsidiary's net sales, which artificially inflated RAC's quarterly operating income by between 13 and 28 percent, the subsidiary's annual operating income by 13 percent, and Raytheon's

annual earnings by 7 cents per share. Raytheon did not disclose RAC's non-GAAP bill and hold

practices in any of its 1997 Forms 10-Q or its Form 10-K, which each noted RAC's "record

sales" and "record operating income." In January 1998, the company filed a Form S-3

registration statement and subsequent prospectus supplements for a $3 billion shelf registration

and takedown of securities. These filings made no mention of RAC's improper bill and hold

accounting and also incorporated by reference Raytheon's prior misleading periodic reports as

well as all future periodic reports that Raytheon would file with the Commission.

      15.    In 1998, RAC's bill and hold sales inflated the segment's quarterly operating

income by 20 and 100 percent in the second and fourth quarters, respectively, and RAC's annual

operating income by 13 percent. Raytheon, however, did not disclose RAC's bill and hold

practices in its 1998 SEC filings but again described RAC's "record" sales and operating income

and "increased" aircraft shipments. In December 1998, Raytheon was aware that RAC had only

been able to achieve its year-end sales and profit goals through "significant green sales" activity,

which increased the company's fourth quarter earnings by 8 cents per share. As a result,

Raytheon met analyst expectations that quarter. Raytheon's 1998 Form 10-K, however, stated

that "Revenue from aircraft sales are generally recognized at the time of shipment," omitting a

description of RAC's non-GAAP bill and hold accounting practices.

      16.    In 1999, RAC's improper bill and hold sales practices led to material

misstatements of the subsidiary's operating income in the first, second, and third quarters.

Raytheon again made no disclosure of these practices. In July 1999, the company filed another

Form S-3 registration statement and subsequent prospectus supplements related to its $3 billion

shelf registration and takedown of securities. These filings made no mention of RAC's improper

bill and hold accounting practices and also incorporated by reference Raytheon's prior

misleading periodic reports as well as all future filings made by the company.

17.    At year-end 1999, Raytheon restated its prior financial results to correct the

improper bill and hold accounting that had occurred prior to that time, which indicated that the

company had materially misstated RAC's reported quarterly and annual operating income in the

nine Forms 10-Q, and two Forms 10-K that the company had filed during fiscal years 1997,

1998, and 1999.  The company, however, improperly attributed the restatement to additional

"clarification" supposedly provided by "new guidance" on revenue recognition set forth in SAB

101, which had been issued by the Commission in December 1999, instead of the improper

accounting practices that had occurred at RAC with the knowledge and involvement of senior

management prior to that time.

### RAYTHEON'S IMPROPER ACCOUNTING AND DISCLOSURES FOR ITS COMMUTER BUSINESS

18.    Between 1997 and 2001, Raytheon also deferred substantial losses related to

RAC's line of commuter aircraft.  These planes were typically used by small, thinly capitalized

airlines to transport passengers along regional or local routes.  These carriers were generally seen

as significant credit risks, were thus frequently unable to obtain independent financing for their

aircraft purchases, and typically lacked sufficient cash on hand to make outright purchases of

RAC's commuter aircraft.

19.    As a result, RAC rarely sold its new or used 1900s for cash.  Instead, over 90

percent of RAC's sales were financed by the subsidiary's captive finance company, Raytheon

Aircraft Credit Corporation ("RACC"), which offered below-market interest rates and other

favorable terms to customers in order to increase demand for the 1900s.  These terms were not

favorable to the company and contributed to its increasing debt burden.  RAC also regularly took

7

used commuter aircraft (model 1900Bs and 1900Cs) in trade for the purchase of newer planes (model 1900Ds) which left RAC with a supply of used 1900s in inventory.

20.    RACC sold most of its aircraft receivables, including commuter financing receivables, into a revolving credit facility funded by an outside bank syndicate, which removed the debt associated with these financed sales from the company's balance sheet.  Under the terms of the credit facility agreement, Raytheon was obligated to re-purchase certain delinquent and defaulted receivables, and the level of recourse to Raytheon averaged between 75 to 100 percent depending upon the type of financing.  RACC also renegotiated and restructured many of the payment arrangements it had with certain RAC customers in order to keep these customers from becoming overly delinquent or otherwise defaulting on their notes.

### Between 1997 and 1998, Raytheon Saw a Declining Commuter Market

21.    During the late 1990s, RAC began to experience softening demand for its commuter aircraft due to, among other things, shifting consumer preferences, increased government regulation of nineteen-seat aircraft, increased competition in the used aircraft market, and the introduction of regional jets.  These and other factors combined to place downward pressure on the sales prices, lease rates, and asset values of these planes.  Thus, in 1997, RAC began for the first time to place used 1900s with customers on operating leases and substantially ceased outright sales of used 1900s for cash.

22.    In addition, many of the used commuters that RAC received as returns, repossessions, and trade-ins required significant refurbishment before RAC could re-market them.  These refurbishment costs were capitalized as part of the aircraft's book value, which led to "[h]igher book values" that "can and do exceed fair market value."  In response, RAC adopted a policy of depreciating the used commuter aircraft on an accelerated basis during the life of their

8

leases to "bring down values" to amounts that were more likely to be recovered in later cash sales. By so doing, RAC improperly deferred and re-characterized losses associated with high commuter book values as ordinary depreciation.

23.     In April 1998, Raytheon's internal audit department identified that the capitalization of RAC's refurbishment costs was leading to inflated book values for the commuter aircraft. Although senior RAC management agreed to establish limits on the carrying values of used 1900Cs at $3.4 million to $3.7 million, by year-end 1999, more than twenty 1900Cs in inventory had book values of more than $4 million per plane net of specific reserves.

24.     By late 1998, Raytheon was aware of potential risks, uncertainties, and adverse trends in RAC's commuter business. For example, in October 1998, a RAC sales plan noted that the "US market continues to be soft for this size [of] aircraft." In December 1998, an internal Raytheon analyst wrote that "[t]he 19-seat turboprop market is in trouble" and described several factors that were "clearly putting the viability of the 1900D in doubt." Later that month, after being informed that "the market for the 1900D appears to be in decline" and "continuing 1900D financing is probably RAC's major financial exposure," Burnham, who had just become Raytheon's CEO, observed that "clearly, the 1900D is a worry" and asked senior RAC management "how solid is our build/sell forecast?" Burnham further authorized a series of external studies into the future market demand for commuters and an internal financial analysis of the risks associated with these aircraft.

### Raytheon's Improper Accounting and Disclosures in 1997 and 1998

25.     Raytheon made no meaningful disclosures of the known risks, trends, and uncertainties associated with the deteriorating state of RAC's commuter business, such as the softening demand for commuters, the increasing trend in returns and repossessions, and the

movement in RAC's commuter placement program away from sales and to begin offering leases, in any of the company's SEC filings from 1997 through 1998.

26.    Raytheon also engaged in improper accounting for RAC's commuter business that served to offset the negative effects that the declining commuter market was having on asset values for the 1900s during this time period. For example, Raytheon transferred $15 million in "corporate reserves" to RAC at year-end 1997, which RAC initially used to "off-set" potential exposures associated with over-valued 1900s. The company did not properly disclose or account for these reserves, however, which represented 7 percent of RAC's reported annual operating income that year. Although this $15 million charge should have been taken to ordinary operating income, Raytheon reported it as a "special charge" reflecting the write down of unidentified "non-current assets" at RAC. In addition, instead of using the charge to write down the non-current commuter assets held for lease, RAC ultimately used this reserve to absorb losses incurred in subsequent periods when aircraft were refurbished.

27.    Furthermore, during 1997 and the first three quarters of 1998, Raytheon was aware that RAC had not implemented and was not complying with FAS 125 (the new guidance for off-balance sheet accounting that became effective on January 1, 1997). However, in its 1997 Form 10-K, the company stated that it had adopted this standard in 1997 and that this purported adoption "did not have a material effect on the company's financial position or results of operations." In 1998, Raytheon continued to be aware that "management ha[d] yet to record the sale of receivables in full accordance with FAS 125" and that "[t]he SEC has recently raised concerns about registrants' reporting under FAS 125." Yet, it was not until the fourth quarter of 1998 that RAC began to implement FAS 125. However, RAC based its FAS 125 calculations on incomplete and inaccurate data and also improperly measured its recourse liability obligations on

the receivables sold into the credit facility. As a result, for 1998, Raytheon reported additional operating income of $18 million on the sale of commuter receivables to the credit facility instead of a $9 million loss. Proper FAS 125 accounting would have reduced RAC's reported annual operating income by $27 million (11 percent) at year-end.

28.    RAC also established reserves for commuter losses equal to any FAS 125 gains that were recognized on the sale of commuter receivables. This practice of making perfectly off-setting adjustments left no trace on RAC's reported earnings. As a result, Raytheon's reported financial statements did not accurately reflect the accounting impact of declining commuter values. For example, in the fourth quarter of 1998, Raytheon recorded a $6.5 million gain on the sale of commuter receivables, which was offset by an equal $6.5 million reserve for commuters. No documentation supported the amount of the $6.5 million loss provision, and the amount reserved corresponded to nothing other than the amount of the recorded gain. At the time, the improper $6.5 million adjustment amounted to nearly 8 percent of the subsidiary's fourth quarter 1998 operating income of $82 million.

### In 1999, Raytheon Deferred Significant Commuter Losses

29.    Due to unrelated difficulties in its defense businesses and engineering and construction unit, Raytheon announced an unexpected $640 million charge during 1999, which caused the price of the company's stock to fall 44 percent in one day. The charge in 1999 also led to a downgrading of the company's bond and credit ratings, and Raytheon continued with its strategy to pay down its debt by divesting certain "non-core" commercial units. RAC was one of the segments targeted for divestiture as part of this strategy.

30.    Throughout 1999, Raytheon and certain senior officers (including Burnham) were made aware of potential negative and adverse trends, uncertainties, and risks related to RAC's commuter business. In April 1999, an outside consultant informed Raytheon that the commuter

market was "at a turning point," that other "[c]arriers have begun to flood the market with…used 19-seat airplanes," that "lease rates for used 19-seat aircraft [we]re declining," that the "[d]ownward pressure on lease rates w[ould] grow as the surplus of 19-seat aircraft expands," and that "[a]dditional lease rate pressures could impact the company's asset values and re-marketing efforts." Burnham was briefed on this situation and management's views of it.

31.    Also in April 1999, a senior Raytheon financial officer was informed that these "surplus" aircraft and "lower lease rates could drive declining asset values and represent a potential material write down" of the commuter assets. This officer was further informed that there was an "obvious" need for a "material write-down" of RAC's commuter assets, that these losses were "large and growing," that RAC was engaging in "misleading financial reporting," and that the situation was "as bad as [one executive had ever] seen."

32.    In May 1999, an internal Raytheon study forecasted that RAC's commuter portfolio would generate an estimated $95 million in losses due to "[t]he lack of portfolio equity, poor customer credit and payment behavior, high loan-to-value ratios, and the modest level of reserves" established for these assets. That same study identified a "worst case scenario" that could generate $200 million in additional losses depending upon the impact of the "upcoming introduction" of regional jets. Burnham was briefed on this situation and management's views of it.

33.    In June 1999, a senior Raytheon financial officer was advised that there was an estimated exposure of $300 million to $500 million in marking the RACC portfolio to market.

34.    Also in June 1999, Burnham and other senior Raytheon officers received a "response" from RAC to the April and May 1999 external and internal studies. This response set forth the view of RAC management that there was greater demand for new commuter aircraft

than forecast by the company's outside consultant. RAC's response also advised that it was "a corporate decision" whether to "build reserves" on the commuters, but this would occur "at the expense of current period profits." RAC's response instead proposed addressing the $95 million commuter exposure identified in May 1999 through "third party, no recourse notes," which would provide an estimated $93 million "improvement." These sales did not materialize, however. Yet, reserves were not adequately increased.

35.    In July 1999, in connection with an attempt to securitize all of RAC's aircraft receivables, the company's investment bankers informed Raytheon that the commuter portfolio should be valued "at a material discount to its current book value," that "actual collateral values may be substantially lower than loan balances," and that "[p]ortfolio policies may be masking problems from being recognized."

36.    In August 1999, as part of an initial consideration to divest RAC, Burnham and other senior Raytheon finance executives were informed that there was "approximately $250 Million - $350 Million risk in [the] $2.4 Billion loan/lease portfolio," and the "risk is likely to approach the high end of this range over time" since "about 40% of loan/lease payments are delinquent" and "business cycle downturn may also drive up defaults [and] reduce residual values of used aircraft."

37.    In the Fall of 1999, after the initial effort to divest RAC failed, Raytheon attempted to sell RAC's portfolio of aircraft receivables (including its commuter receivables) to an outside finance company. The finance company, however, informed Raytheon that it would not purchase any of the commuter loans due to concerns over their high loan-to-value ratios and high concentrations in certain customers. The finance company also provided Raytheon with an independent valuation analysis of the 1900s, which stated that the commuter industry was

experiencing a "distinct reduction in sales activity" and a "downturn" in leasing activity over the past year. This report also listed estimated market values for the 1900s that were below their book values.

38.     At year-end 1999, Burnham and others in senior Raytheon and RAC management were informed that the company's outside auditors had a "continued concern about commuter portfolio exposure" and, if there is "any slip," the commuter inventory "balance will balloon." In addition, following a number of production and accounting problems that arose at RAC as part of the year-end close, the subsidiary's CEO stepped down from his executive position, and Burnham traveled to the subsidiary to make it clear that RAC personnel had to improve their processes to prevent similar issues from occurring in the future.

39.     Thereafter, in early 2000, RAC's newly-installed CEO instructed his staff to critically examine the subsidiary's operations, and Servello took the lead role in identifying issues to be examined. As part of this review, Servello and other RAC personnel identified a potential $220 million exposure related to the commuter assets on and off the balance sheet. This estimate was calculated by comparing "[p]rices which could be readily obtainable in today's market" to commuter book values. The market values used in the analysis averaged from $500,000 to $1 million below the commuter book values. However, the company did not write down its commuter assets or adequately increase its commuter reserves at that time. Instead, based on overly optimistic internal analyses prepared by RAC executives, the company concluded that no "event of impairment" had occurred.

40.     In January 2000, Raytheon had issued an earnings advisory for the fourth quarter of 1999 and the full year 2000 because of aircraft production delays at RAC, a restatement due to RAC's improper bill and hold accounting, higher interest expenses, a higher effective tax rate,

and other unfavorable results. Following this announcement, Raytheon's stock price fell
approximately 17 percent in one day. And, by March 2000, it was reported that Raytheon's bond
and credit ratings might be further downgraded "[i]f corrective actions do not lead to material
long-term improvements in overall performance and its balance sheet, or if material new
operating problems emerge...."

## Raytheon's Improper Accounting and Disclosures in 1999

41.     Raytheon did not make adequate disclosures of the negative and adverse trends,
uncertainties, risks, and other information related to RAC's commuter aircraft or the subsidiary's
commuter business in the company's SEC filings from 1999. Raytheon's 1999 Form 10-K did
refer to "commuter valuation costs" as one of five factors affecting RAC's "decline in operating
income as a percent of sales in 1999," but this disclosure failed to provide adequate information
concerning the known material and adverse risks, uncertainties, and trends posed by the
commuters.

42.     In addition, the forward-looking statements in Raytheon's 1999 Form 10-K stated
that "the effect of market conditions, particularly as it affects the general aviation market, the
impact of competing products and pricing, [and] the impact on recourse obligations of RAC due
to changes in the collateral value of financed aircraft" were among the many "factors that could
cause actual results to differ," but did not mention "commuter" aircraft by name or provide
adequate information about the negative trends, uncertainties, and risks concerning the
commuters that were known to management at the time. Likewise, another set of forward-
looking statements in Raytheon's 1999 Form 10-K stated that "continued market acceptance of,
and government regulations affecting, 19-seat turboprop commuter aircraft" could affect RAC's

future results of operations, but Raytheon did not disclose the significant information it had about the declining commuter market and the exposures facing the company.

43.    These forward-looking statements were inconsistent with disclosures in the footnotes to the company's 1999 financial statements, which misleadingly stated that "the Company does not expect to incur any material losses against the net book value of the long-term receivables" because "it is the Company's policy to have the aircraft serve as collateral for the commuter airline receivables;" that "any liability arising from these transactions will not have a material effect on the Company's financial position, liquidity, or results of operations" given Raytheon's experience to date with resale activities and pricing and the Company's plan to continue production into the foreseeable future; and that "[t]hese financial instruments are recorded at estimated fair value. No material gain or loss resulted from the sales of receivables." As Raytheon was aware, the fair value of the commuter aircraft serving as collateral for the corresponding receivables was declining given the deteriorating market conditions for these planes. Yet, the company was not adequately increasing its reserves for these anticipated short falls, causing significant potential future liability under its recourse provisions to the revolving credit facility.

44.    In addition, contrary to the company's footnote disclosures, during 1999, RAC continued its incorrect practice of using FAS 125 gains on commuter receivables sold into the credit facility to set up equally off-setting commuter loss reserves. As a result, Raytheon's reported financial statements did not accurately reflect the accounting impact of declining commuter values.

(a)    For example, in the third quarter of 1999, RAC increased its "cushion" for commuter losses by roughly $11 million given the improper FAS 125 gains it recognized

on the sale of commuter receivables into the credit facility. RAC, however, subsequently reduced that increase by roughly $7 million in the fourth quarter of 1999 that offset a significant FAS 125 loss caused by a reduction in Raytheon's credit rating.

(b)    These adjustments represented approximately 17 and 19 percent of the subsidiary's reported operating income/loss in the third and fourth quarters of 1999, respectively.

45.    Also, RAC still had not properly applied FAS 125 to its off-balance sheet commuter receivables during 1999. As a result, RAC's reported annual operating income should have been reduced by at least $21 million (13 percent) at year-end.

**In 2000, Raytheon Remained Aware that the Commuter Market Continued to Deteriorate**

46.    In 2000, a variety of internal and external sources continued to inform Raytheon and RAC executives that the market for 1900s was in substantial decline. These sources further indicated that there were actual material commuter losses at RAC and that the potential losses associated with the 1900 line were in the hundreds of millions of dollars.

47.    In January 2000, Burnham, Servello, and other senior Raytheon and RAC officers learned that the company's strategic planning department viewed RAC as having a substantial negative economic value due in large part to $240 million in negative value and exposure associated with RAC's off-balance sheet commuter and general aviation receivables.

48.    In February 2000, an outside consultant reported to Raytheon that there would be "[c]ontinued downward pressure on turboprop lease rates due to falling demand for new units and a growing supply of used capacity" and that "demand for new [commuters] will average 7 to 12 sales annually," well below what RAC was planning to manufacture that year.

49.    In March 2000, auditors with a major public accounting firm that had been retained to perform a review of RAC's "used commuter program exposures" informed certain

members of senior Raytheon and RAC management (including Servello) that "the Company's largest exposure in the [commuter] portfolio is with potential returned aircraft" and that "the book values of certain aircraft in the portfolio exceed the current market values." In particular, these auditors identified a $115 million "shortfall" associated with RAC's 1900Cs that were on and off the balance sheet. The auditors also noted that RAC personnel were "rejecting cash offers on commuter aircraft because of the income statement repercussions . . . [implying that] the carrying amounts of commuter airplanes exceed their fair market values." The auditors further noted that RAC only wrote down used commuter asset values "when the Company enters into a new finance/lease transaction." The auditors also reported that RAC lacked formal and documented policies and practices concerning the accounting for commuter aircraft, commuter loan restructurings, the creation of commuter valuation reserves, and the monitoring of customer accounts and collections.

50. In April 2000, Raytheon's internal audit department prepared a report for members of senior Raytheon and RAC management (including Servello) on the work that had been undertaken at the request of RAC's new CEO, as set forth in Paragraph No. 39 above. Although the report concluded that no impairment of the commuters had occurred, it did inform management that there was an "[u]ndetermined but likely to be significant" exposure related to the used commuter assets since "[t]he book values and refurbishment costs on used aircraft may exceed fair market value of cash sales...." The internal audit report further stated that there was another "undetermined" exposure associated with the subsidiary's commuter bad debt reserve since the "[v]aluation and review of assets [wa]s not performed timely or regularly." In addition, the internal audit report warned that there was "[n]o active collection effort" against delinquent commuter customers and the "non-performing segment" of the commuter portfolio was

18

"increasing." The report also stated that management should "closely monitor this portfolio as changes will impact the accuracy of assumptions.... [A]ctions which might impair used commuters further include...change[s] in selling strategies and lease terms...large returns of aircraft which cannot be absorbed into lease market...[and an] overt decision not to support the line (such as pulling back significantly on new production)."

51.    In the months that followed, senior RAC executives tracked on a quarterly basis an estimated $220 million "net exposure" in the commuter portfolio given existing reserve levels, and these analyses were provided to others in senior RAC management, including Servello.

52.    In June 2000, a RAC commuter marketing plan noted that loan values for 1900s continued to be "significantly above fair market values" by upwards of $1.3 million per aircraft. Shortly thereafter, a draft sales plan warned RAC personnel to "[m]anage used commuter reserves cautiously and avoid an accounting event."

53.    In July 2000, auditors with the same major public accounting firm that had previously analyzed RAC's "used commuter program exposures" prepared a report for the company that analyzed Raytheon's off-balance sheet commuter receivables. This report highlighted significant problems related to the commuters, including high levels of delinquencies and repossessions and "between $10 million and $200 million of collateral exposure" that was not reflected by RAC's accounting and restructuring methodologies, such as the practice of recognizing losses only upon a new sale or lease of the aircraft instead of upon return or repossession.

54.    Between April and July 2000, Raytheon's outside investment bankers provided the company with a series of valuation analyses for the commuter receivables in connection with

the company's efforts to sell RAC and/or its portfolio of commuter financing receivables to an outside buyer. These analyses indicated that a sale of RACC's portfolio of commuter receivables might generate losses of between $63 million and $622 million on a secured basis, depending on the underlying assumptions, and that the value of discounted cash flows on the portfolio was between $200 million and $273 million lower than the total loan balances, depending upon the underlying assumptions. Given his involvement in the effort to divest RAC and/or its commuter line, Burnham was aware that no buyer expressed a real interest in acquiring the commuter business in whole or in part.

55.     In the Summer of 2000, a senior RAC executive told Burnham and a senior corporate financial officer of his significant concern about a problem with the commuters in the "half a billion dollar" range based on his view of the number of idle aircraft that were then in inventory and the substantial number of commuter returns that were forecasted at year-end. Ultimately, Raytheon addressed this problem by transferring pension income to RAC to gradually build up commuter reserves.

## Raytheon's Undisclosed Transfers of Pension Income

56.     In the third quarter of 2000, Raytheon began to allocate $14 million in surplus pension income to RAC each quarter, which was generated by an over-funded pension plan that had been retained when Raytheon divested another business unit. As Raytheon's CEO, Burnham was informed of and approved the transfers. Servello and others were aware that the surplus pension-related income was "to be used to help supplement reserves that we [at RAC] had on our books.... [W]e applied it to the booked reserves as a general reserve increase...."

57.     In November 2000, senior RAC executives were told to "[a]nticipate that the $14M per quarter coming from the 'over[-]funded pension income is available indefinitely.'"

Thereafter, RAC personnel projected that they would continue to receive $14 million in pension-related income per quarter through at least 2004, which would enable the subsidiary to build up nearly $260 million in commuter reserves.

58.    These surplus pension transfers were not disclosed in the company's SEC filings because management viewed them as immaterial. They, in fact, represented 24 to 353 percent of RAC's reported quarterly operating income between the third quarter of 2000 and the second quarter of 2001; eliminated the comparability of the segment's current results with prior periods; represented 17 percent of RAC's reported annual operating income in 2000; and failed to disclose a three-year decline in the segment's annual operating income from $227 million in 1998, to $163 million in 1999, to $136 million in 2000 (absent the pension income).

### Raytheon's Improper "Pooling" of Commuter Aircraft

59.    In the fourth quarter of 2000, at the direction of a senior corporate financial officer and others, RAC personnel (including Servello) instituted an improper "pooling" analysis when testing RAC's on-balance sheet commuter assets for impairment under FAS 121. This approach pooled aircraft on an aggregate basis, not on a plane-by-plane basis as required by GAAP, which enabled the company to use $45.7 million in "cushions" associated with low-book-value aircraft to off-set losses associated with higher-book-value aircraft. Raytheon then used these "benefits" to lower the book values of its used 1900Bs and 1900Cs in small amounts at year-end 2000, and the company made no disclosure of the aircraft's declining value.

60.    In addition, even though the company's "pooling" analysis suggested that RAC did not need reserves on the 1900s that were held for sale, the company kept $26.4 million in commuter reserves on RAC's books and continued to transfer $14 million in excess pension-related income to the subsidiary each quarter on a going forward basis for continued increases to

a "general commuter reserve," which indicated that the anticipated losses associated with the 1900s were greater than the current level of reserves that had been established at RAC.

## Raytheon's "Soft Landing" Plan for the Commuters

61.    By late 2000, Burnham and other senior Raytheon and RAC officers were aware that "[m]arket forces ha[d] created a non-performing asset problem" with the 1900s. Specifically, contemporaneous internal company documents show that, at December 31, 2000, RAC's inventory of used commuters had increased to over 100 airplanes due to an exceptionally high number of commuter returns and repossessions at year-end, and RAC expected significant commuter returns in the years ahead.

62.    During January 2001, in response to a perceived "market shift" concerning the commuters, RAC drafted a new "1900 Business Plan" intended to "steer[] to a 'soft landing' in 4 years" by (i) further reducing the build rate for new 1900Ds to one plane per month (the minimum production rate that the subsidiary could sustain without incurring an operating loss); (ii) moving away from RAC's historic commuter financing and leasing strategies to instead "sell 1900B[s and] 1900Cs for cash" at prices that were "well below" existing book values; and (iii) building up RAC's commuter reserves by at least an additional $240 million through the continued allocation of surplus pension-related income to facilitate such sales.

63.    The new "reduced cash sale prices" were approved by senior Raytheon management (including Burnham and senior corporate financial officers) in early January 2001, and the plan projected that the revised "cash sale" values for the commuters would create at least $60 million in anticipated losses in 2001 alone. These losses, however, were going to be charged against the reserves that were being built up at RAC through the transfers of surplus pension-related income and, thus, would not be reflected in Raytheon's reported financial statements.

64.     Servello and others at the company were also aware of the strategy to move to "cash sales," including the effort to "maximiz[e] conversion of 1900Cs for cash" and use "gross margin generated by additional [commuter sales] to fund more sales." Consistent with the company's new commuter business plan, by February 2001, RAC's commuter sales force was instructed that "the operating lease program they had relied upon [in] the previous few years to place used commuters was gone.... In its place were new lower cash prices on 1900Cs and 1900Ds plus an emphasis on cargo sales."

### Raytheon's Inadequate Disclosures in 2000

65.     Raytheon did not make adequate disclosures of the negative, adverse, and material trends, uncertainties, risks, and other information described above related to RAC's commuter operations and the subsidiary's commuter line in the company's SEC filings for 2000. Raytheon also did not disclose in its SEC filings the transfer of surplus pension income to RAC or the improper testing of RAC's on-balance sheet commuter assets on a "pooled" basis. In addition, Raytheon did not disclose the "soft landing" plan for RAC's commuter line, including the decision to emphasize cash sales at prices that were "well below" book values to address a perceived "market shift" in the commuter business.

66.     Although Raytheon's Forms 10-Q for the second and third quarter of 2000 did cite "pricing pressure on commuter aircraft" as one of the factors affecting RAC's operating income, these disclosures did not adequately describe the substantial negative information concerning the commuters that was known to management at the time. Similarly, Raytheon disclosed in its third quarter 2000 Form 10-Q that "a downturn in demand could have a material adverse effect on the company's financial position or results of operations" and in its 2000 Form 10-K that the company would "continue to...watch for any indications of a downturn in demand

for RAC's aircraft," but these disclosures incorrectly suggested that management was not yet aware of any such downturn in the commuter aircraft market or its severity.

67.     Raytheon also made disclosures concerning the effect of overall market conditions in the forward-looking statements of the company's SEC filings for 2000 that did not provide adequate information concerning the deteriorating state of the commuter aircraft market and the negative effect that this decline was having on RAC and commuter asset values.  For example, in its 2000 Form 10-K, Raytheon included the forward-looking statement that the company's "operating results may vary significantly over time for a variety of reasons, many of which are outside of our control," such as "the impact on recourse obligations at Raytheon Aircraft due to changes in the collateral value of financed aircraft…[and] general economic conditions, particularly the cyclical nature of the general aviation…market[] in which we participate."  These disclosures made no mention of "commuter" aircraft by name and did not reflect that the company was aware of significant losses related to RAC's commuter assets and anticipating that these losses would continue to grow in the future.

68.     In addition, Raytheon disclosed in other forward-looking statements in the company's annual report that some of the "[i]mportant factors that could cause actual results to differ" were "the effect of market conditions, particularly in relation to the general aviation and commuter aircraft markets; [and] the impact on recourse obligations of Raytheon Aircraft due to changes in the collateral values of financed aircraft, particularly commuter aircraft,"  These statements were contrary to other disclosures in the footnotes to the company's 2000 financial statements, which misleadingly stated that the company had a secure line of commuter financing receivables, that any liability resulting from the sale of commuter receivables into the revolving credit facility "will not have a material effect on the Company's financial position, or results of

operations" given Raytheon's "experience to date with resale activities and pricing and the Company's plan to continue production into the foreseeable future," and that "[n]o material gain or loss resulted from the sales of receivables in 2000, 1999, or 1998." These disclosures did not reflect a move to cash sales of commuter aircraft at prices that were well below book value, a significant reduction in the 1900D build rate, actual material commuter losses at RAC, and potential losses associated with the 1900 line in the hundreds of millions of dollars.

69.    As Raytheon's CEO, Burnham reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 65 to 68 above.

### Raytheon's Improper Accounting in 2000

70.    From the early 1990s and throughout 2000, RAC used an improper reserve practice known as the "Min/Max" analysis, which was a non-GAAP practice of considering RAC's reserves in the aggregate and, thus, used over-accruals in some reserves to cover short-falls in others. RAC's process of maintaining excess reserves in some areas because they off-set short-falls in reserves in other areas was not disclosed by Raytheon, was inconsistent with GAAP, and led to the keeping of inaccurate books, records, and accounts at the RAC segment. For example, between 1998 and 2000, RAC's excess reserves related to its parts business and general aviation aircraft, which were used to off-set under-accruals in other areas, such as those related to commuter receivables, totaled as much as $19.6 million and represented as much as 61 percent of the subsidiary's total reserves.

71.    In addition, as described in Paragraph Nos. 56 to 58 above, the establishment of $56 million in additional commuter reserves through the transfer of surplus pension income to RAC between the third quarter of 2000 and the second quarter of 2001 was inconsistent with GAAP. No adequate contemporaneous documentation supported the amount of these commuter

loss provisions, and the amount reserved corresponded only to the amount of the surplus pension income available. As Raytheon's CEO, Burnham was informed of and approved these surplus pension-related transfers. As RAC's Deputy CFO and Controller, Servello was also aware of these transfers and their use to increase commuter reserves.

72.     In 2000, Raytheon's outside auditors also informed members of senior Raytheon and RAC management (including Servello) that it was "not appropriate" to pool commuter aircraft when testing for impairment under FAS 121 because they "d[id] not represent a large pool of homogenous assets." The auditors, therefore, posted a $12 million audit adjustment, which represented the supposed "benefit" that the company obtained through pooling. Raytheon, with the knowledge of its auditors, did not book the adjustment because it was considered to be immaterial to the company's consolidated financial results. As Raytheon's CEO, Burnham was aware of this decision. The $12 million audit entry, however, represented approximately 7 percent of RAC's reported operating income for 2000 and, thus, was material to the financial results reported for that segment.

73.     In 2000, Raytheon's outside auditors further informed senior Raytheon and RAC executives (including Servello) that RAC "ha[d] not appropriately accounted for the gain or loss on notes sold to [the revolving credit facility]" or properly measured other components of the FAS 125 calculation and, thus, offered to sell RAC an improved FAS 125 model. However, RAC took no substantive steps to comply with FAS 125 during the calendar year. Instead, senior members of the Raytheon and RAC financial organizations "resist[ed]" the purchase of the new model, and, at year-end 2000, the outside auditors were still raising the issue of RAC's failure to comply with FAS 125 with Raytheon. While the company did adopt the new FAS 125 model advocated by its auditors before filing its 2000 Form 10-K, this model also failed to comply with

GAAP. Because much of the data serving as the inputs for this model was incomplete and inaccurate, the new FAS 125 model materially misestimated the amount of RAC's various off-balance sheet assets and liabilities. Also, the new FAS 125 model calculated a $22 million overstatement related to prior period FAS 125 gains, but Raytheon did not make this audit entry because it was deemed immaterial to the company's consolidated financial results. As Raytheon's CEO, Burnham was aware of the decision not to book this proposed adjustment. Such a charge, however, would have reduced RAC's reported annual operating income for 2000 by 13 percent (from $164 million to $142 million) and, thus, was material to the segment.

74.     Finally, had senior Raytheon and RAC management timely recognized losses inherent in their planned "soft landing" of the commuter aircraft line, the company would have been required to take a charge of at least $67 million at year-end 2000, and contemporaneous internal company documents and other information indicate that Burnham, Servello, and other senior Raytheon and RAC officers were expecting commuter losses of $240 million given the cash sales prices that had been approved in the "soft landing." A charge of $67 million to $240 million at year-end 2000 would have reduced RAC's reported annual operating income by at least 41 to 146 percent and Raytheon's 2000 profit before taxes by at least 8 to 27 percent.

### In 2001, Raytheon Continued to Be Aware of the Ongoing Decline in the Commuter Market and Wrote Down these Assets after September 11, 2001

75.     Throughout 2001, senior Raytheon executives continued to be aware of the ongoing decline of the commuter market and how this decline was creating serious operational issues at RAC, including substantial actual and anticipated losses associated with the 1900s on and off the company's balance sheet.

**The First and Second Quarters of 2001**

76.    In addition to moving to a cash sales strategy for the 1900s at prices that were significantly below the carrying value of the aircraft, in early 2001, Raytheon attempted to purchase risk insurance for the cash flows associated with the 1900D notes receivable in the company's off-balance sheet commuter portfolio.  During these discussions, the insurer informed Raytheon that an independent appraiser had determined that the company was over-valuing these assets by roughly $220 million (approximately 20 percent above their actual market value).

77.    In addition, during the first quarter of 2001, a senior corporate financial officer had the lead RAC auditor removed from the engagement due to that partner's unwillingness to "ignore SEC and GAAP errors" at the officer's insistence and the partner's requests for consults on various accounting issues with his firm's national office, which were resulting in adverse accounting treatments for the company.

78.    By April 2001, Raytheon was aware that RAC had not sold any used commuters for cash under the "soft landing" plan during the first quarter and that recent offers for used 1900Cs were "in the $1.2M range," which was "far below" the initial "cash sale" estimates of $2.2 million approved by management as part of the "soft landing."  Raytheon was further aware that "each cash order looks like it will require a great deal of focus and effort to get the ball over the goal line.  Simply put, it's harder to sell for cash, but...we knew this 'going in.'"  In response to this statement, one senior Raytheon executive explained that $1.5 million was a "more realistic" price for these used aircraft and further emphasized the need to "raise cash" on these sales.

79.    In June 2001, a RAC sales forecast informed a senior Raytheon financial officer and others that "[a] clear trend exists that prices will have to continue to be lowered to move

inventory…. In order to get more cash sales in Q4, the price will have to be lowered to between $1.1 - $1.5 MM. This could create accounting issues." Senior Raytheon financial officers were also informed that it would be necessary to "discount heavily" and offer 1900Cs at between $1.1 million to $1.5 million in order to make sales for cash. These officers were further informed that RAC's 2001 sales forecast was "contingent" upon these values. These transactions, however, were blocked by a senior corporate financial officer and others in the financial organization because "these deals could cause a write down of the entire portfolio and, as a result, we need to sell the airplanes at a higher value." As set forth in internal company documents, "[w]e cannot afford to change NRVs [the Net Realizable Values of the aircraft] below $2,500,000" due to the income statement repercussions for the company. "Price integrity issues and limited reserves prevent us from lowering prices to meet a large portion of the market. Market pricing will require additional reserves."

80.    In July 2001, the company's investment bankers provided Raytheon with an update of earlier analyses of the company's commuter portfolio. This analysis indicated that, at the close of the second quarter, there was at least $113 million to $198 million in losses associated with the on- and off-balance sheet commuters given the difference between their book and assumed collateral values. This analysis also indicated that the value of the discounted cash flows from the on- and off-balance sheet commuters were $431 million to $528 million below their total book values.

81.    In August 2001, Raytheon convened a "commuter summit" at the company's corporate headquarters to discuss the state of the commuter market and the negative effect this decline was having on RAC's commuter business. At this meeting, an outside consultant informed senior Raytheon and RAC management that "[c]ompetitive market pressures are

29

intense. Critically, they are not anticipated to ease anytime soon…. Turboprop aircraft orders have stagnated at best…. Only a handful of companies still operate 19-seat turboprops…. The prognosis for U.S. 19-seat operators is not very good….” Downward pricing pressure is not anticipated to ease as the number of surplus 20 to 35 seat turboprop aircraft grows, making them more attractive as 19-seat replacements…. With turboprop aircraft demand falling and supply raising, pricing must reflect basic market conditions not internal benchmarks.”

82.    At this “commuter summit,” another outside consultant reported that estimates of fair market value for the commuters were, on average, $2 million below book value for the 1900Cs and $1.3 million below book value for the 1900Ds. At the time, the company had over 130 1900Cs and nearly 320 1900Ds on and off the balance sheet, making for an estimated exposure of approximately $676 million.

### Raytheon’s Improper Disclosures in the First and Second Quarters of 2001

83.    Despite the substantial information that Raytheon possessed concerning the decline in RAC’s commuter aircraft business and the erosion of commuter asset values, the company’s first quarter 2001 Form 10-Q did not adequately disclose these adverse views of and developments in RAC’s commuter operations, including management’s decision to move from a leasing to a cash sales strategy for used commuters. Instead, Raytheon’s disclosures in this filing discussed only “commercial” aircraft in general, which covered several other product lines in addition to the commuters. Because these and other disclosures covered all of RAC’s “new and used” commercial aircraft, the company did not make adequate disclosure of the negative risks and trends related to the commuters that were known to senior management at the time.

84.    Raytheon’s second quarter 2001 Form 10-Q, which was filed one week after the August 2001 commuter summit, also did not adequately disclose the negative risks and trends

associated with the company's commuter aircraft. For example, Raytheon only disclosed that RAC's second quarter 2001 "[o]perating income was down primarily due to the lower sales volume and margin pressure on T-6A, Beechjet, and used aircraft due to the current market environment. During 2001, RAC experienced softness in orders for new and used commercial aircraft. The Company remains concerned about the market outlook at RAC. During the second quarter of 2001, RAC responded to a softening market by announcing workforce reductions and adjustments in production rates." These disclosures made no specific mention of "commuter" aircraft and failed to adequately disclose the negative risks and trends concerning the commuters that were known to senior management at the time.

85.    The only disclosure specifically referencing "commuters" in Raytheon's second quarter 2001 filing concerned "[t]he aging on RAC's commuter customer financing receivables [which] has deteriorated over the past year. Non-performance on these loans and leases, in the aggregate, could have a material adverse effect on the Company's liquidity." At this time, senior Raytheon officers had been informed that there were hundreds of millions of dollars of actual and potential losses associated with these receivables based on the analyses that the company's investment bankers had performed and the other information the company had received. Thus, Raytheon failed to adequately disclose the significant declines in the commuter market, recent restructuring of several commuter customers to keep them from defaulting on their notes payable, and the substantial financial repercussions that would follow given the company's recourse obligations to the bank facility.

86.    In both its first and second quarter 2001 filings, Raytheon also made inadequate disclosures about the potential effect of market conditions in its forward-looking statements. In particular, in both Forms 10-Q, Raytheon stated that of the many "[i]mportant factors that could

cause actual results to differ" were "the effect of market conditions, particularly in relation to the general aviation and commuter aircraft markets; [and] the impact of recourse obligations of Raytheon Aircraft due to changes in the collateral values of financed aircraft, particularly commuter aircraft." These disclosures, however, failed to provide investors with sufficient information concerning the negative trends and risks associated with the commuters that were known by management at the time. The inclusion of these disclosures in the company's forward-looking statements gave the inaccurate impression that Raytheon was not presently facing any risks associated with its on- and off-balance sheet commuter assets during these time periods.

### Raytheon's Equity Offering

87.    In early 2001, Raytheon turned to the equity markets to raise capital to pay down its debt. In April and May 2001, Raytheon filed a Form S-3 and prospectus supplements in connection with its $3 billion shelf registration and takedown of equity securities. These filings contained materially misleading statements and omissions concerning the commuters because:

(a)    Raytheon's Form S-3 incorporated prior filings by reference and thus repeated the misleading statements from those periodic reports. In addition, Raytheon did not disclose the material and adverse trends and uncertainties that were known to management at the time concerning the commuters. The company's Form S-3 also incorporated by reference "any future filings made by us...until we sell all of the securities." As alleged below, these future filings were also misleading.

(b)    In addition, in the forward-looking statements, Raytheon made disclosures about "regional aircraft" and "price pressures within the market" but did not specifically reference commuters by name. Similarly, Raytheon disclosed that "a decline in demand in the market for our aircraft, would have an adverse effect, which may be material, on

our financial results," but did not describe the declining commuter market or RAC's deteriorating commuter business. Likewise, in other forward-looking statements, Raytheon disclosed that "[t]he value of our securities may fluctuate as a result of considerations that are difficult to forecast, such as…the impact on recourse obligations at Raytheon Aircraft Company due to changes in the collateral value of financed aircraft…and general economic conditions, particularly the cyclical nature of the general aviation and other commercial markets in which we participate." Raytheon, however, did not specifically mention the known risks posed by the deteriorating state of the commuter market, RAC's growing inventory of used commuter aircraft, or the over-valued commuter financing receivables that were off the company's balance sheet.

88.    As Raytheon's CEO, Burnham reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 83 to 87 above.

## Raytheon's Improper Accounting and Disclosures in the Third Quarter of 2001 and at Year-End

89.    Although Raytheon was aware that its on- and off-balance sheet commuter assets were over-valued by hundreds of millions of dollars as of August 31, 2001, it was not until after the terrorist attacks on September 11th that the company began the process of a write down. However, much of the information which management used to estimate fair value for the commuters was "from three weeks earlier or four weeks earlier, in August of 2001…. [N]one of the publicly available data [used in the write-down analysis] were post-September 11th." Senior Raytheon financial officers also considered offers that RAC had received from commuter customers during "the most recent year," even though these officers had previously refused to sell planes for these prices in July 2001 since "these deals could cause a write down of the entire portfolio…." Also, a post-September 11th "top down, market study" upon which Burnham and a

senior Raytheon financial officer relied to support the final charge estimated that there was $400 million to $500 million in pre-existing exposure on the commuters as of July 2001. This amount represented roughly 60 to 70 percent of the $693 million charge that was ultimately taken by the company. As the Vice President of Investor Relations informed senior management near completion of the write down, a survey of buy- and sell-side analysts prior to the upcoming earnings call indicated that "defense companies get a free pass this quarter" given recent events. These analysts were further "expecting a $400-500 million charge" on the commuters, and they would be "irritated" with the company "if we do not take this opportunity to adjust these values."

90.     Thus, in the third quarter of 2001, Raytheon stated that it had taken a $693 million loss provision related to RAC's commuter aircraft as "a result of continued weakness in the commuter aircraft market and the impact of the events of September 11, 2001." This misleading statement was repeated in substance in the company's 2001 Form 10-K. Given the charge that the company should have taken at year-end 2000 to properly account for RAC's on- and off-balance sheet commuter assets and the $240 million in commuter reserves that the company planned to build to cover anticipated losses, the $693 million commuter loss provision that Raytheon took in the third quarter of 2001 was materially overstated by at least 10 to 53 percent.

91.     Raytheon also did not disclose that its third quarter 2001 commuter loss provision was largely determined by implementing for the first time a market-based measure of portfolio loss under FAS 140, the successor to FAS 125. Contrary to its public disclosures, the company had previously been calculating its recourse liability obligations on the commuter receivables sold into the credit facility through a pooled, probable loss analysis. In addition, Raytheon did not disclose that certain "excess" non-commuter reserves, such as those related to RAC's parts business and general aviation aircraft, which had previously been used in the Min/Max analysis

34

to off-set under-accruals on the commuters, were not written off in the third quarter of 2001. Instead, these reserves were retained by the company for their original, specified purposes, indicating that they should not have been used to off-set deficiencies in the commuter reserves in prior periods.

92.     As Raytheon's CEO, Burnham reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 90 to 91 above.

## THE IMPACT OF RAYTHEON'S IMPROPER ACCOUNTING AND DISCLOSURE PRACTICES

93.     As a result of the improper disclosure and accounting practices described above, Raytheon filed at least fifteen quarterly reports, five annual reports, and four registration statements and prospectus supplements that contained materially false and misleading disclosures and financial statements.

### FIRST CLAIM
**Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act**
**(Against Raytheon and Burnham)**

94.     Paragraphs 1 through 93 above are realleged and incorporated herein by reference.

95.     Raytheon filed registration statements on January 15, 1998, July 9, 1999, April 6, 2001, and October 22, 2001 in connection with securities offerings by Raytheon that incorporated certain false and misleading periodic reports previously filed by the company.

96.     In these offers or sales of securities, Raytheon, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the offer or sale of Raytheon securities, (a) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading and (b) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

97.     In the April 6, 2001 and October 22, 2001 offers or sales of securities, Burnham, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the offer or sale of Raytheon securities, (a) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and (b) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

98.     By reason of the foregoing, Raytheon and Burnham violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

## SECOND CLAIM
### Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 (Against Raytheon, Burnham, and Servello)

99.     Paragraphs 1 through 98 above are realleged and incorporated herein by reference.

100.     As alleged more fully above, Raytheon filed with the Commission materially false and misleading financial statements as part of its annual reports on Form 10-K and quarterly reports on Form 10-Q, respectively.

101.     As a result of the foregoing, Raytheon violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

102.    Burnham and Servello knowingly or recklessly provided substantial assistance to Raytheon in connection with its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

103.    As a result of the foregoing, Burnham and Servello aided and abetted Raytheon's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

### THIRD CLAIM
**Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rule 13b2-1
(Against Raytheon, Burnham, and Servello)**

104.    Paragraphs 1 through 103 above are realleged and incorporated herein by reference.

105.    As alleged more fully above, Raytheon failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.  Raytheon also directly or indirectly, falsified or caused to be falsified certain books, records, and accounts.  In addition, Raytheon failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP, or any other applicable criteria, and to maintain accountability for assets.

106.    As a result of the foregoing, Raytheon violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

107.    Burnham and Servello knowingly or recklessly provided substantial assistance to Raytheon in connection with its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

108.    As a result of the foregoing, Burnham and Servello aided and abetted Raytheon's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

(a)    ordering Raytheon to pay a civil penalty in the amount of $12 million pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and disgorgement in the amount of $1.00;

(b)    ordering Burnham to pay a civil penalty in the amount of $100,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and disgorgement of certain past bonus payments in the amount of $875,000 plus pre-judgment interest thereon in the amount of $263,344.37;

(c)    ordering Servello to pay a civil penalty in the amount of $15,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and disgorgement of certain past bonus payments in the amount of $15,000 plus pre-judgment interest thereon in the amount of $4,628.28; and

(d)    granting such other and further relief as this Court deems just and proper.

Dated: June 28, 2006
      Washington, DC

                                          Christopher J. Stewart (DC Bar No. 474010)
                                          John D. Worland, Jr.
                                          Timothy N. England
                                          Beth Collier Groves
                                        Attorneys for Plaintiff
                                          Securities and Exchange Commission
                                          100 F Street, N.E.
                                          Washington, DC 20549-0713
                                          (202) 551-4542
                                          (202) 772-9231 (Fax)